DAVID H. KRAMER, State Bar No. 168452, *dkramer@wsgr.com*
MICHAEL H. RUBIN, State Bar No. 214636, *mrubin@wsgr.com*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

*Attorneys for Nonparty Respondents*
*Artis Capital Management, L.P.,*
*Sequoia Capital Operations LLC and*
*TriplePoint Capital LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| VIACOM INTERNATIONAL INC., ET AL.<br><br>    Plaintiffs,<br><br>    v.<br><br>YOUTUBE, INC., ET AL.<br><br>    Defendants.<br>_____ | CASE NO.: 3:08-MC-80129-SI<br><br>**RESPONDENTS' OPPOSITION TO PLAINTIFFS' JOINT MOTION TO COMPEL PRODUCTION OF DOCUMENTS PURSUANT TO SUBPOENAS TO ARTIS CAPITAL MANAGEMENT L.P., SEQUOIA CAPITAL OPERATIONS LLC, AND TRIPLEPOINT CAPITAL LLC**<br><br>DATE: August 15, 2008<br><br>TIME: 9:00 a.m.<br><br>JUDGE: Hon. Susan Illston |
| THE FOOTBALL ASSOCATION PREMIER LEAGUE LIMITED, ET AL.,<br><br>    Plaintiffs,<br><br>    v.<br><br>YOUTUBE, INC., ET AL.<br><br>    Defendants.<br>_____ | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 4

A.  The Underlying Litigation ........................................................................................ 4

　　1.  YouTube's Operations, Influence, and Commitment to Copyright Protection ....... 4

　　2.  Plaintiffs' Suits and the Digital Millennium Copyright Act ................................. 6

B.  The Non-Parties ........................................................................................................ 7

　　1.  Artis and Its Investment in YouTube .................................................................... 7

　　2.  TriplePoint and Its Equipment Loan and Lease to YouTube ................................ 8

　　3.  Sequoia and Its Investment in YouTube ............................................................... 8

C.  The Subpoenas and the Meet and Confer Process .................................................. 9

D.  The Matters Actually in Dispute ............................................................................ 10

E.  The Burden on the Non-Parties .............................................................................. 11

ARGUMENT ....................................................................................................................... 12

I.  Relevant Standards ................................................................................................. 12

II.  Plaintiffs' Subpoena Requests Seek Documents That Should Be Obtained From Defendants YouTube And Google To The Extent They Are Relevant At All ................ 13

　　A.  Plaintiffs Should Not be Permitted to Seek from Third Parties Materials that are by Definition in the Possession of their Litigation Adversaries ..................... 13

　　B.  Internal Analyses Generated by the Non-Parties are Irrelevant to Plaintiffs' Litigation Against Google and YouTube ............................................................... 15

III.  Request Numbers 8, 19, 20, and 21 Are Invalid for Additional Reasons ........................ 16

　　A.  Plaintiffs' Time Period Instruction Is Grossly Overbroad and Seeks Irrelevant Information ............................................................................................................. 16

　　B.  Request Number 8 Is Overbroad and Seeks Irrelevant Information Regarding Potential Investments in YouTube ....................................................... 17

　　C.  Request Numbers 19, 20, and 21 Are Overbroad and Seek Irrelevant Information Regarding Google's Acquisition of YouTube .................................. 18

　　D.  Requiring Further Search and Review Would Impose an Undue Burden ........... 19

IV.     Any Production by the Non-Parties Must Be Governed by a Suitable Protective
        Order Entered by this Court ......................................................................................... 21

CONCLUSION ................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

## CASES

*Beinin v. Ctr for the Study of Popular Culture*,
   C06-2298, 2007 WL 832962 (N.D. Cal. Mar. 16, 2007) ...................................................12

*Braxton v. Farmer's Ins. Group*,
   209 F.R.D. 651 (N.D. Ala. 2002) ...................................................................................15

*Dart Indus. Co. v. Westwood Chem. Co.*,
   649 F.2d 646 (9th Cir. 1980).........................................................................................12

*Dibel v. Jenny Craig, Inc.*,
   No. 06 CV 2533, 2007 WL 2220987 (S.D. Cal. Aug.1, 2007) ........................................14

*E.E.O.C. v. Lexus Serramonte*,
   237 F.R.D. 220 (N.D. Cal. 2006) ...................................................................................14

*Exxon Shipping Co. v. U.S. Dept. of Interior*,
   34 F.3d 774 (9th Cir. 1994).........................................................................................12

*Harris v. Wells*,
   No. B-89-391, 1990 WL 150445 (D. Conn. Sept. 5, 1990) .............................................14

*Haworth, Inc. v. Herman Miller, Inc.*,
   998 F.2d 975 (Fed. Cir. 1993) .......................................................................................14

*Katz v. Batavia Marine & Sporting Supplies, Inc.*,
   984 F.2d 422 (Fed. Cir. 1993) .......................................................................................12

*Moon v. SCP Pool Corp.*,
   232 F.R.D. 633 (C.D. Cal. 2005) ...................................................................................14

*Night Hawk Ltd. v. Briarpatch Ltd, L.P.*,
   No. 03 CIV 1382, 2003 WL 23018833 (S.D.N.Y. Dec. 23, 2003)...................................12

*Perfect 10, Inc., v. CCBILL LLC*,
   488 F.3d 1102 (9th Cir. 2007).........................................................................................6

*Visto Corp. v. Smartner Info. Sys., Ltd.*,
   Nos. 06-80339 and 06-80352, 2007 WL 218771 (N.D. Cal. Jan. 29, 2007) .............15, 16

## STATUTES

17 U.S.C. § 512(c)...........................................................................................................6

17 U.S.C. §512(m) ..........................................................................................................5

## RULES

Fed. R. Civ. P. 26(b)(2)...................................................................................................12

Fed. R. Civ. P. 26(b)(2)(c) ..............................................................................................13

Fed. R. Civ. P. 45(a) ................................................................................................... 12

Fed. R. Civ. P. 45(a)(2)(C) ......................................................................................... 21

Fed. R. Civ. P. 45(c)(1) ............................................................................................... 13

Fed. R. Civ. P. 45(c)(3)(A) .......................................................................................... 13

Fed. R. Civ. P. 45(c)(3)(B) .......................................................................................... 13

**PRELIMINARY STATEMENT**

Plaintiffs' Motion to Compel ("Motion") non-party discovery from non-party Respondents Artis Capital Management L.P. ("Artis"), Sequoia Capital Operations LLC ("Sequoia"), and TriplePoint Capital LLC ("TriplePoint") (collectively, the "Non-Parties"), is heavy on rhetoric and overgeneralizations, but thin on substance and facts.

Two of the Non-Parties are venture capital firms that provided early seed money to YouTube Inc. ("YouTube"), a site that would go on to become the leading user-generated video service on the Internet, growing faster than any other online service in history.  The other non-party here, TriplePoint, is a debt and equipment financier who provided early equipment financing to YouTube.

After sitting by and watching YouTube grow exponentially for over a year, Plaintiffs brought copyright infringement claims against YouTube and Google Inc. ("Google") in the Southern District of New York seeking a windfall in damages.  In the coordinated actions, Plaintiffs allege that YouTube should be held responsible for the infringing activities of users who upload materials to the service without appropriate authorization.  Through their claims, Plaintiffs seek to eviscerate the Digital Millennium Copyright Act ("DMCA"), the legislative compromise Congress struck in 1998 to shield online services in precisely these circumstances.

Artis, Sequoia and TriplePoint do not warrant so much as a mention in Plaintiffs' Complaints.  That is not surprising, as, contrary to the story Plaintiffs concoct in their Motion, the Non-Parties' involvement with YouTube was quite limited.  Artis was an entirely passive investor, and had no role at all in the company's operations.  TriplePoint merely provided financing for YouTube to lease equipment in exchange for stock warrants, and likewise had no involvement.  While Sequoia selected an individual to sit on the YouTube board, the venture fund's connection with the company lasted only a year and ended long ago.  Despite these indisputable facts, early in the case, Plaintiffs served each of the Non-Parties with grossly overbroad and burdensome subpoenas (the "Subpoenas").  The Subpoenas mirror Requests for Production ("RFPs") that had already been served on Defendants YouTube and Google; indeed, 15 of the 24 Subpoena categories are *identical* to RFPs served on Defendants.

Plaintiffs took no steps with their subpoenas to avoid imposing undue burden or expense on the Non-Parties.  While the Non-Parties could have simply refused to produce documents, they instead engaged in extensive, arduous negotiations with Plaintiffs over a nearly seven-month period, during which the Non-Parties attempted to rehabilitate Plaintiffs' demands.  Through that process, in the interests of compromise and the avoidance of motion practice, the Non-Parties agreed to produce a significant volume of documents tied to their involvement with YouTube.  Declaration of Scott Wilkens in Support of Plaintiffs Joint Motion to Compel ("Wilkens Decl."), Exhs. DD, EE, FF, GG, HH, KK, WW.  At Plaintiffs' insistence, the Non-Parties long ago conducted time-consuming and burdensome searches for these materials and are prepared to produce (or already have produced) them.

Plaintiffs' Motion obscures the fact of the Non-Parties' good faith negotiations and their agreement on most of discovery Plaintiffs demanded.  In this respect, Plaintiffs' Motion is aggressive and unreasonable as their original Subpoenas.  After all this time and effort, Plaintiffs cannot take the concessions they obtained and ignore the concessions they made.  Such tactics are unreasonable, all the more so in the context of non-party discovery.

In point of fact, while the Subpoenas each contain 24 Requests, the only issues that were *not* resolved during the conference process are:  (i) an objection to Plaintiffs' overbroad time period for the Subpoenas; (ii) a partial objection to Request Number 8; and (iii) objections to Request Numbers 19, 20, 21.[1]  With respect to these issues, no further production should be compelled.[2]

On the question of relevant time periods, Plaintiffs' demand that the Non-Parties produce documents spanning nearly five years is excessive.  Although YouTube was founded in February 2005, Plaintiffs seek documents extending back more than a year earlier, to January 2004.  On the other end of the spectrum, Plaintiffs demand documents extending all the way to *today*, more

---

[1] Assuming that Plaintiffs will abide by (or be held to) their agreements and in the interests of avoiding a recitation of seven months of negotiations, the Non-Parties do not brief their objections to demands where agreement was ultimately reached between them.  *Compare* Motion at 15-19.  If any of those Requests truly remain in dispute in light of the prior agreements, the Non-Parties request the opportunity to brief them separately.

[2] As described *infra* at Factual Background Section D, in a further effort to limit the instant dispute, the Non-Parties withdraw their partial objection to Request Number 5.

than a year and half after the Non-Parties' respective investments with (and connection to) YouTube came to an end. The burden associated with searching through an additional two and half years worth of documents, in some cases stored only back up tapes, far outweighs the potential relevance of documents Plaintiffs speculate might exist somewhere in that haystack. The Non-Parties have already agreed to produce significant volumes of documents dating from YouTube's founding—in all cases *many months* before their investments—to the date those investments ended. That nearly two-year period is the relevant timeframe here and Plaintiffs are overreaching in their effort to more than double it.

It is equally improper for Plaintiffs to demand that the Non-Parties produce all information they received from YouTube or Google (apparently regardless of subject matter), when Plaintiffs can seek all such information directly from the Defendants in the first instance. Indeed, the parties to the litigation and the presiding Court are in a considerably better position to evaluate the legitimacy and breadth of such requests. As a matter of law, Plaintiffs should not be burdening non-parties with demands for discovery that they could easily obtain from their litigation adversaries. That is all the more true here, as Plaintiffs have made no showing at all that the information they demand is not available from the Defendants.

Plaintiffs' demand for the Non-Parties' internal analyses of YouTube is even more misguided. Plaintiffs apparently hope that the Non-Parties at some point themselves analyzed YouTube's potential liability for copyright infringement. But even if they had, such analyses by non-parties would be wholly irrelevant. The Non-Parties' internal discussions, if any, about hypothetical liability would in no way inform the question of the Defendant's actual liability.

Even if Plaintiffs' demands were justified in the abstract, any relevance the documents might have is easily outweighed by the significant burden that production would impose on the Non-Parties if they were obligated to go back and search *again* for responsive documents. The Non-Parties have already expended considerable time and resources searching for and reviewing their files in response to Plaintiffs' demands. They should not now be made to repeat that burdensome process.

Finally—and contrary to Plaintiffs' assertions—any production should be governed by a suitable protective order entered by this Court, not the New York court in the underlying litigation.  The Non-Parties and their documents are located in California, the Subpoenas were issued out of this Court, and this Court has now been called upon to enforce aspects of the Subpoenas.  It is this Court that should be the one to address the related issues concerning terms of production and enforcement of those terms.  The Non-Parties should not have to bear the expense and burden of going to a New York court to enforce the terms of a protective order—an entirely possible scenario given that Plaintiffs *have already been found* to have violated the New York protective order.

## FACTUAL BACKGROUND

**A.      The Underlying Litigation**

Plaintiffs filed this miscellaneous action concerning discovery in two underlying copyright cases pending in the United States District Court for the Southern District of New York.  Throughout their brief, Plaintiffs purport to describe the issues in that litigation, offering skewed assertions about YouTube, Google and the Non-Parties.  While Plaintiffs' advocacy is generally irrelevant to the issues presented by this Motion (and although Defendants are in the best position to respond to Plaintiffs' assertions), a more balanced presentation of the underlying case may assist the Court.

**1.      YouTube's Operations, Influence, and Commitment to Copyright Protection**

YouTube provides a free online platform that allows any individual to upload videos and allow them to be viewed by tens of millions of people around the world.  An individual user creates a free account and then, without YouTube's participation, selects files to be uploaded to YouTube that can be viewed by anyone with an Internet connection.  Again without YouTube's participation, the individual user determines what videos to post and selects the title and keywords that are assigned to each clip to identify and help others find it.

Since its founding in 2005, YouTube has become the fastest growing site in the history of the Internet and a social phenomenon.[3]  Just a few examples illustrate YouTube's unique role in politics, culture, and education:

❖ In 2007, the Democratic and Republican Parties held separate debates in which their candidates for President faced questions not from professional journalists, but from ordinary Americans who posted their videos on YouTube.

❖ Major universities around the world have posted videos of lectures and classes on YouTube, allowing anyone with an Internet connection free access to college-level instruction in a variety of subjects, from physics to Shakespeare; the videos uploaded by the University of California at Berkeley alone have received over 1.4 million views to date.

❖ Last year, Queen Elizabeth II posted her annual Christmas message on YouTube, allowing her to reach a worldwide audience in a way never before possible.[4]

While YouTube is mindful of the possibility that its users may upload video clips to the service that they do not have the right to share, YouTube simply cannot monitor or control the staggering volume of material uploaded each day.  The sheer magnitude of the task renders such monitoring impossible.  More importantly, a third party reviewer looking at a video, could not determine: (1) whether the content of that video is subject to copyright protection in the first place; (2) who the copyright owner is; (3) whether the person or entity posting the material is the copyright holder; (4) whether that owner has licensed the content to others to post or view, either expressly, or impliedly by allowing it remain available after learning about it; or (5) whether the posting of that video is otherwise permitted by law, for example, by the doctrine of fair use.  In recognition of these practical limitations, Congress explicitly relieved online service providers of monitoring or investigative obligations when enacting the DMCA.  *See* 17 U.S.C. §512(m) (service providers' immunity from copyright infringement claims shall not be conditioned on "a

---

[3] *See, e.g., YouTube's video boom 'a social phenomenon*,' San Francisco Chronicle Online, Oct. 10, 2006 (at http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2006/10/10/MNG54LLVSO1.DTL&feed=rss.news).

[4] *See YouTube video debate actually worked*, CNET News.com, July 23, 2007 (http://www.news.com/YouTube-video-debate-actually-worked/2100-1028_3-6198405.html); *Thanks to YouTube, Professors Are Finding New Audiences*, Chronicle of Higher Education, Jan. 9, 2008 (http://chronicle.com/free/2008/01/1159n.htm); *Queen posts holiday speech on YouTube*, National Post Online (http://www.nationalpost.com/news/Story.html?id=197497).

service provider monitoring its service or affirmatively seeking facts indicating infringing

activity").  Instead, "[t]he DMCA notification procedures place the burden of policing copyright

infringement—identifying the potentially infringing material and adequately documenting

infringement—squarely on the owners of the copyright."  *Perfect 10, Inc., v. CCBILL LLC,*

488 F.3d 1102, 1113 (9th Cir. 2007).  Accordingly, YouTube relies on information it receives

from copyright owners regarding allegedly unauthorized material posted to its site.  And whenever

it receives an appropriate notice of an allegedly infringing video clip, YouTube expeditiously

disables access to the disputed clip.[5]

### 2.    Plaintiffs' Suits and the Digital Millennium Copyright Act

Plaintiffs, the alleged creators and owners of various copyrighted video content, filed two

separate lawsuits in New York, on March 13 and May 4, 2007, respectively.  Plaintiffs allege that

YouTube and Google (based on its acquisition of YouTube in November 2006) are liable for

direct, contributory, and vicarious copyright infringement based on material uploaded to the

YouTube service by users.  Wilkens Decl. Exhs. M, N.

Plaintiffs' suits seek to undermine the legislative compromise embodied in the DMCA.

Congress enacted the DMCA in 1998 in an effort to encourage the development of online services

by affording them immunity against a variety of copyright infringement claims.  The DMCA

creates a "safe harbor" for service providers like YouTube, which store, at the direction of their

users, material on their systems that may infringe a third party's copyrights.  17 U.S.C. § 512(c).

In return, service providers must act promptly upon receipt of notices of alleged infringement from

---

[5]  It is worth mention that YouTube has led the online industry in developing measures to
help copyright owners identify and prevent the unauthorized use of their content online.  By way
of example only, YouTube:  (1) requires its users to agree to terms that expressly prohibit
uploading material that the user is not authorized to post; (2) repeatedly warns users who are
uploading a clip that they must have the rights to do so and provides a "Copyright Tips" page to
help users determine whether their upload is permissible; (3) does not generally permit the
uploading of clips longer than 10 minutes, which prevents users from posting longer-running
copyrighted content, such as television shows and feature films; (4) has created a Content
Verification Program that allows copyright owners to flag disputed videos and request their
removal with the click of a button; (5) terminates the accounts of users who repeatedly violate the
company's copyright policies and removes from the site all videos posted by such users; and (6)
automatically blocks users from posting video clips that previously have been taken down for
violating the company's copyright policies.  In addition, YouTube has rolled-out a groundbreaking
technological solution (known as the "YouTube Video ID System") that assists participating
copyright holders in identifying their content on YouTube's service and allows them prospectively
to determine where and how that content can appear, if at all.

1  copyright holders to remove disputed materials from their service.  In this way, the statute

2  balances the interests of copyright owners and online services.  Today, countless online services,

3  ranging from Amazon, eBay, Facebook, and MySpace, to Plaintiffs' own services like iFilms and

4  MTV.com, rely upon (and perhaps owe their existence to) the DMCA.

5  **B.    The Non-Parties**

6       Plaintiffs describe the Non-Parties as "venture capital firms that made early-stage

7  investments" in YouTube.  Motion at 2, 4.  Plaintiffs' Motion is devoid of virtually any specific

8  information about Artis and TriplePoint.  Instead, in broad brushstrokes, Plaintiffs paint *all three*

9  of the Non-Parties monolithically, as having "privileged" access to YouTube-related information

10  and "privileged" influence over YouTube's management—to the point of allegedly controlling

11  YouTube or acting as YouTube's agent.  Motion at 4, 23.  This is simply false.

12       **1.    Artis and Its Investment in YouTube**

13       In March 2006, Artis invested in YouTube during its Series B round of financing.

14  Declaration of David Lamond in Support of Respondents' Opposition to Plaintiffs' Joint Motion

15  to Compel Production of Documents Pursuant to Subpoenas ("Lamond Decl.") ¶ 4.  From the

16  beginning of its investment, Artis maintained the role that it typically does in its investments:  *as*

17  *a strictly passive investor*.  *Id.* at ¶ 5.  Pursuant to the financing agreement, Artis received

18  periodic reports from YouTube about YouTube's financial and business progress, but that

19  information was no different from what any passive investor would normally receive in the

20  course of its investment.  *Id.* at ¶ 6.  Artis exercised no control over, and never participated in,

21  the strategic planning or development of YouTube's business model or day-to-day operational

22  management.  *Id.* at ¶ 7.  There is no reason why Plaintiffs cannot obtain *from YouTube* all of the

23  information that Artis itself received *from YouTube*.  *See infra* at Argument, Section II.

24       Artis played no more active a role in Google's acquisition of YouTube.  As a YouTube

25  shareholder, Artis was asked to approve the merger agreement.  Lamond Decl. ¶ 7.  Other than

26  voting on the merger—which Artis did alongside other investors and based on the

27  recommendation of YouTube's Board of Directors—Artis was strictly passive.  *Id.*  Artis did not

28  conduct due diligence for or analyze the merger agreement.  *Id.*

### 2. TriplePoint and Its Equipment Loan and Lease to YouTube

TriplePoint is a debt and equipment financier. In April and August 2006, TriplePoint entered into contracts with YouTube that allowed YouTube to lease and ultimately purchase computer servers from TriplePoint. In exchange, TriplePoint obtained warrants to buy YouTube stock at TriplePoint's option. Declaration of Kevin Thorne in Support of Respondents' Opposition to Plaintiffs' Joint Motion to Compel Production of Documents Pursuant to Subpoenas ("Thorne Decl.") ¶¶ 4-6. At no point did TriplePoint exercise control over YouTube or become involved in decision-making or the setting of business strategies at YouTube. *Id.* at ¶ 7. Not surprisingly, given its attenuated role, TriplePoint had no involvement in Google's acquisition of YouTube. *Id.* at ¶ 12. TriplePoint did not conduct due diligence for the merger agreement, and certainly did not analyze the agreement regarding potential copyright infringement liability for YouTube or Google. *Id.*

### 3. Sequoia and Its Investment in YouTube

Sequoia had a more significant relationship with YouTube than did Artis or TriplePoint because its investment came earlier in the company's history and on different terms. The relationship was nonetheless limited.

Sequoia invested in YouTube's Series A and B rounds of funding, which closed in October 2005 and March 2006 respectively. Declaration of Melinda Dunn in Support of Respondents' Opposition to Plaintiffs' Joint Motion to Compel Production of Documents Pursuant to Subpoenas to Artis Capital Management L.P., Sequoia Capital Operations LLC, and TriplePoint Capital LLC ("Dunn Decl.") ¶¶ 5, 7. Along with its investment, Sequoia was given the right to send a non-voting delegate to YouTube board meetings. Roelof Botha therefore served as one of YouTube's directors from October 2005 through November 2006, when Google acquired YouTube, extinguishing Sequoia's involvement with the company. *Id.* at ¶¶ 3-6. For roughly a year then, a Sequoia representative served on YouTube's board and was involved at least to some extent, in the company's high-level decision making. It is in recognition of that involvement that Sequoia has already agreed to produce a substantial quantity of documents from that time period.

**C.    The Subpoenas and the Meet and Confer Process**

On September 28, 2007, Plaintiffs served identical Subpoenas on Artis and Sequoia, each seeking the same 24 categories of documents.  A month later, on October 29, 2007, Plaintiffs served the identical Subpoenas on TriplePoint.  Each Non-Party Investor timely objected.  Wilkens Decl. Exhs. G-L.  The Subpoenas were not only identical to each other, but also virtually identical to—and thus nearly entirely duplicative of—RFPs that had already been served on Defendants YouTube and Google in the litigation.  Specifically, 15 of the 24 requests in the Subpoenas are identical to RFPs served on YouTube and Google.  *Compare* Wilkens Decl. Exhs. A-F (Requests 6-8, 10, 12-15, 17-23) *with* Declaration of Michael Rubin in Support of Respondents' Opposition to Plaintiffs' Joint Motion to Compel Production of Documents Pursuant to Subpoenas to Artis Capital Management L.P., Sequoia Capital Operations LLC, and TriplePoint Capital LLC ("Rubin Decl.") ¶¶ 2, 3, Exhs. A, B (RFPs 6, 26-32, 35-37, 40, 41, 49, 64).

The Subpoenas are exceptionally broad, owing to the fact that they were cut and pasted from RFPs sent to the Defendants.  They demand documents dating from January 1, 2004 to the *present*, and include demands such as "Each document and all electronically stored information *concerning* any of the Defendants [YouTube and Google]," and "Each document and all electronically stored information *concerning* all communications between you and any one of the Defendants [YouTube and Google]."  Wilkens Decl. Exhs. A-F (Requests 1 and 4).  Apparently recognizing how broad and unreasonable their Subpoenas were, Plaintiffs almost immediately agreed not to pursue five of their requests.  Wilkens Decl.,  Exh. DD.

In good faith, the Non-Parties engaged in extensive negotiations with Plaintiffs regarding their objections and production.  During the process, which spanned seven months, the Non-Parties agreed to produce a substantial portion of the requested documents.  Indeed, the parties ultimately reached agreement on (or Plaintiffs agreed not to pursue) Request Numbers 1, 3, 4, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 22, 23, 24 in the Subpoenas.  *See* Wilkens Decl. Exhs. EE, FF, GG.  Through this process, the Non-Parties expended considerable time and resources conducting a reasonable and diligent search for the responsive documents that they had agreed to

produce.  Dunn Decl. ¶¶ 13-17; Thorne Decl. ¶¶ 16-17; Declaration of Robert Riemer in Support of Respondents' Opposition to Plaintiffs' Joint Motion to Compel Production of Documents Pursuant to Subpoenas ("Riemer Decl.") ¶ 4.

**D.**      **The Matters Actually in Dispute**

On May 19, 2008, Plaintiffs detailed the sole "remaining areas of dispute" in a letter to the Non-Parties.  Wilkens Decl., Exh. GG.  Those areas are (i) the time period covered by the requests, and (ii) requests concerning Google's acquisition of YouTube or other potential investments in or potential acquisitions of YouTube:

> Instructions 1:
> "Unless otherwise indicated, the time period covered by these requests is January 1, 2004 through the present."

> Request Number 8:
> Each document and all electronically stored information concerning any actual *or potential* investment in, or financing provided to, and/or any actual *or potential* divestments of, YouTube including (a) all communications with Defendants and/or *potential* or actual investors in, or providers of financing to, YouTube, including any representations made concerning YouTube's business model; (b) all documents prepared for or presented to actual or *potential* investors in, or providers of financing to, YouTube, including any representations made concerning YouTube's business model; and (c) all documents received from actual *or potential* investors in, or providers of financing to YouTube; and (d) all documents analyzing or assessing investments in or the financing of YouTube, whether prepared by you, Defendants or a third party.

> Request Number 19:
> Each document and all electronically stored information concerning Google's acquisition of YouTube, including any reports, analyses or assessments carried out by you, Google, YouTube, investment banks, or any other person, and including any communications between or among you, Google, YouTube and any investor in YouTube or Google.

> Request Number 20:
> Each document and all electronically stored information concerning Google's acquisition of YouTube that refers to actual or proposed indemnification or an actual or proposed litigation reserve in relation to copyright infringement lawsuits that might be brought against Defendants in relation to the YouTube website.

> Request Number 21:
> Each document and all electronically stored information concerning any person or entity that considered acquiring or merging with YouTube, including persons or entities that entered into negotiations with YouTube regarding a potential acquisition of or merger with YouTube.[6]

---

[6] A partial objection to Request No. 5, concerning production of certain draft documents, also remained unresolved.  In the interests of narrowing the instant dispute, the Non-Parties agree to produce drafts encompassed by Request No. 5, as described in Plaintiffs' December 18, 2007 letter.  Wilkens Decl., Exh. DD at 2.

1    In their Motion, Plaintiffs suggest that the Non-Parties have reneged on their agreement

2 to produce documents.  Motion at 6-9, 15.  Plaintiffs have it backwards.  It is *Plaintiffs* who

3 agreed to limit (or forego entirely) most of their document Requests—and now may be

4 backtracking from their agreements.  Motion at 1, 15-21.  The Non-Parties agreed to produce

5 documents and information pursuant to what they believed were facially improper subpoenas to

6 avoid motion practice and to fully resolve the Subpoenas.  Wilkens Decl., Exh. GG at 5.  The

7 Non-Parties intend to honor those agreements and Plaintiffs should as well.

8 **E.    The Burden on the Non-Parties**

9    The Non-Parties have already expended significant time and expense as a result of the

10 Subpoenas, bearing the excessive burden of collecting the agreed-upon materials.  Sequoia

11 undertook the onerous multi-step process of recreating electronic documents stored on backup

12 tapes.[7]  To accomplish this, Sequoia had to hire an additional IT consultant to locate appropriate

13 tapes, write instructions to extract the relevant data, index the tapes, and retrieve the data to be

14 searched.  Dunn Decl. ¶¶ 15-16.  This took 30 hours, and Sequoia's regular IT consultant was

15 required to work extended hours to deal with other technical issues in order to prevent delays and

16 disruption of Sequoia employees' work flow.  *Id.*  Thereafter, two employees from an outside

17 vendor spent one full week managing the search process and generating a report of relevant

18 documents.  Sequoia's on-site IT consultant managed the vendor through this process.  Dunn

19 Decl. ¶ 16.  TriplePoint's Senior Vice President of Compliance & Legal Administration spent

20 some 40 hours searching for and collecting responsive information, during which time he was

21 diverted from performing his regular duties for the firm.  Thorne Decl. ¶ 15.  Artis spent a full

22 business day searching its physical files; a search of electronically stored information was not

23 conducted because it would require a massive devotion of resources for up to twenty-five full

24 days.  Riemer ¶¶ 4-10.[8]

25

26

27    [7] All of Sequoia's files, including email files dated prior to March 2007, are stored on
backup tapes.  Dunn Decl. ¶ 11.

28    [8] Artis' emails dated before June 2006 reside on backup tapes.  Riemer Decl. ¶ 5.  Emails
dated after June 21, 2006 are archived by an outside vendor.  Riemer Decl. ¶ 9.

**ARGUMENT**

## I.    Relevant Standards

The Federal Rules provide that a party may serve a subpoena to obtain discovery from a non-party. Fed. R. Civ. P. 45(a). Notwithstanding Plaintiffs' suggestion (and practice) to the contrary, *see* Motion at 9-10, there are considerable limits to the reach of a non-party subpoena.

Although nowhere acknowledged in Plaintiffs' Motion, the Ninth Circuit long ago observed that the liberal rule for discovery should *not* apply to non-parties:

> While discovery is a valuable right and should not be unnecessarily restricted, the "necessary" restriction may be broader when a nonparty is the target of discovery. As one district court has noted, "(t)here appear to be quite strong considerations indicating that discovery would be more limited to protect third parties from harassment, inconvenience, or disclosure of confidential documents." One author has stated that the more appropriate nomenclature is "nonparty" discovery, not "third-party" discovery, as "the word nonparty serves as a constant reminder of the reasons for the limitations that characterize 'third-party' discovery."

*Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980) (internal citations omitted); *accord Exxon Shipping Co. v. U.S. Dept. of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) (federal rules "afford nonparties special protection against the time and expense of complying with subpoenas"). Numerous other courts have likewise held that the fact of non-party status should be considered by the court in weighing the burdens imposed under the circumstances. *See, e.g.*, *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993) (citing cases); *Night Hawk Ltd. v. Briarpatch Ltd, L.P.*, No. 03 CIV 1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003) (granting motion to quash subpoena and awarding nonparty sanctions).

A non-party subpoena may only seek relevant, nonprivileged information that does not impose an undue burden. Fed. R. Civ. P. 26(b)(2), 45(c)(3)(A); *see generally Beinin v. Center for the Study of Popular Culture*, C06-2298, 2007 WL 832962, at *2 (N.D. Cal. Mar. 16, 2007) (applying Rule 26 and 45 standards when denying motion to compel non-party discovery).

In addition, a court "must" limit discovery under circumstances that are particularly applicable to non-party discovery:

> (i)    where "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;"

1      (ii)     where "the party seeking discovery has had ample opportunity to obtain information by discovery in the action;" or

2

3      (iii)    where "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

4

5 Fed. R. Civ. P. 26(b)(2)(c).  Importantly, Rule 45 also mandates that a court "must" quash or

6 modify a subpoena that subjects a person to undue burden.  Fed. R. Civ. P. 45(c)(3)(A).

7 Moreover,

8      A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.

9

10 Fed. R. Civ. P. 45(c)(1).  The issuing court "must enforce this duty and impose an appropriate

11 sanction" upon a party who fails to comply with it.  *Id.*  And, a court may limit discovery that

12 seeks to disclose a trade secret or other confidential research, development, or commercial

13 information.  Fed. R. Civ. P. 45(c)(3)(B).[9]

14 **II.**     **Plaintiffs' Subpoena Requests Seek Documents That Should Be Obtained From Defendants YouTube And Google To The Extent They Are Relevant At All.**

15

16     Plaintiffs assert that responsive documents and information purportedly possessed by the

17 Non-Parties "can be divided in two categories."  Motion at 22.  Neither category is appropriate for

18 compelled production.

19     **A.**     **Plaintiffs Should Not be Permitted to Seek from Third Parties Materials that are by Definition in the Possession of their Litigation Adversaries.**

20

21     The first category of documents Plaintiffs seek to compel are the Non-Parties'

22 "communications with Defendants."  *Id.*  By definition, such documents would be available to

23 the Plaintiffs through discovery from Defendants YouTube and Google.  Plaintiffs concede that

24 this "might" be true, but speculate that YouTube's and Google's files may not be complete, for

25

---

26     [9] Tacitly conceding the considerable limitations on non-party discovery, Plaintiffs repeatedly characterize the Non-Parties as parties who are financially aligned with YouTube and Google and thus not "disinterested" or "innocent."  Motion at 2, 6, 9, 13.  As described *infra* at Argument Section II, Plaintiffs' conclusory assertions based on the Non-Parties' indemnification obligations are incorrect.  In any event, whatever purported financial interest the Non-Parties have, that does not change their status from "non-parties" to "parties" in the underlying New York litigation.  Plaintiffs cite no case holding otherwise.

27

28

1    two reasons.  Plaintiffs first note that YouTube employees sometimes used personal email

2    accounts in conducting YouTube business.  Motion at 22.  Even if true, such documentation and

3    information can, and must, be obtained in the first instance from YouTube or its employees

4    directly.  Plaintiffs next assert that YouTube's document retention was "questionable" because it

5    was, at one time, housed in "makeshift offices."  *Id.*  Such conjecture cannot be the basis for

6    imposing the significant burdens Plaintiffs seek to impose here.[10]   At bottom, Plaintiffs cannot

7    impose their broad and burdensome Subpoenas based on pure speculation about what they might

8    not obtain from YouTube's and Google's files.  *See generally Dibel v. Jenny Craig, Inc.*, No. 06

9    CV 2533, 2007 WL 2220987, at *2 (S.D. Cal. Aug.1, 2007) (quashing subpoena, despite finding

10   that it sought relevant information, where documents were "readily obtainable" from

11   defendants); *E.E.O.C. v. Lexus Serramonte*, 237 F.R.D. 220, 223 (N.D. Cal. 2006) (quashing

12   subpoena requesting employee records that were "cumulative, duplicative and irrelevant"); *Moon*

13   *v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005) (quashing subpoena seeking

14   documents that could more easily and inexpensively be obtained directly from parties).

15          Plaintiffs have made no showing of any inadequacies in the Defendants' production

16   (which remains ongoing) or proven that the Non-Parties will have anything that Defendants do

17   not.  As a matter of law, Plaintiffs must first exhaust the production process with YouTube and

18   Google and trouble the Non-Parties if, and only if, they can prove some relevant documents

19   remain unavailable to them.  *See  Haworth, Inc. v. Herman Miller, Inc.*, 998 F.2d 975, 978 (Fed.

20   Cir. 1993) (requiring plaintiff to seek discovery from its party opponent before burdening a

21   nonparty); *Dibel*, 2007 WL 2220987 at *2 ("Plaintiffs may not employ extraordinary measures

22   that are inconvenient, burdensome and expensive to obtain discovery before propounding

23   customary and appropriate Rule 34 requests."); *Harris v. Wells*, No. B-89-391, 1990 WL

24   150445, at *4 (D. Conn. Sept. 5, 1990); (granting party's motion for protective order concerning

25   non-party subpoenas; "[D]iscovery should be stayed against these nonparties until it can be

26

27          [10] Plaintiffs fail to mention another potential reason why Google or YouTube might not
     produce certain documents:  it is possible that documents in Google or YouTube's possession
     would not be produced due to various *agreements of the parties*.  It is entirely inappropriate for
28   Plaintiffs to evade these agreements, and shift the burdens to nonparties, in seeking documents
     that they have agreed not to seek from Google and YouTube.

determined whether or not all the documents sought by the [defendant] can be obtained from the parties."); *Braxton v. Farmer's Ins. Group*, 209 F.R.D. 651, 653 (N.D. Ala. 2002) (granting defendant's motion to quash non-party subpoenas; such discovery cannot proceed "[w]ithout a showing by the plaintiff that the defendant's production of *all* such email messages and other correspondence it can locate is inadequate....") (emphasis in original).  Since Plaintiffs failed to make such a showing in their opening papers, the Court should reject Plaintiffs' efforts to burden the Non-Parties with discovery demands that can be satisfied by the Defendants in the first instance.

> **B.**   **Internal Analyses Generated by the Non-Parties are Irrelevant to Plaintiffs' Litigation Against Google and YouTube.**

The second "category" of documents that Plaintiffs seek to compel consists of the Non-Parties' internal analyses and communications with third parties about Google's acquisition of YouTube and any potential investments in YouTube.  Motion at 22.  But Plaintiffs offer no explanation as to why such documents are relevant to their claims against the Defendants.  In truth, they are not.  In fact, another Court in this District recently and squarely addressed the identical issue.  *Visto Corp. v. Smartner Info. Sys., Ltd.*, Nos. 06-80339 and 06-80352, 2007 WL 218771 (N.D. Cal. Jan. 29, 2007).  In *Visto*, nonparty Meritech, a venture capital firm, was subpoenaed for information pertaining to its internal analysis of defendant Visto and its ultimate decision to invest in Visto.  *Id.* at *4.  The subpoenaing party argued that Meritech's internal documents were relevant to two key issues in dispute, but the Court noted that it "fail[ed] to explain how or why discovery into a venture capital firm's internal investment analyses is 'reasonably calculated to lead to the discovery of admissible evidence' on either point."  *Id.*  The Court then went on to note that "Meritech's analysts may well have looked at and considered the very same types of information and data that a trier of fact—or the parties' respective expert witnesses—would consider when evaluating" the plaintiff's claims, but rejected the very argument made by Plaintiffs here:

> [Plaintiff's] bare assertion that the thought processes of Meritech's analysts and the private conclusions they drew are "clearly relevant" does not make that so.

1  *Id.*

2      Plaintiffs offer no better explanation than the subpoenaing party in *Visto* for why the

3  Non-Parties' internal analyses of YouTube would be relevant to their copyright infringement

4  cases in New York.  Plaintiffs' conclusory assertions that the Non-Parties had "privileged"

5  influence over YouTube's management, or controlled or acted as YouTube's agent, easily fail.

6  Motion at 23.  Plaintiffs' assertions about Artis and TriplePoint are completely false, as they had

7  no "influence" on the company at all.  *See supra* at Factual Background Section E.  As for

8  Sequoia, Plaintiffs' assertions rely solely on the fact that one Sequoia representative (Mr. Botha)

9  served on YouTube's Board of Directors.  But if Mr. Botha undertook analyses or had

10  discussions with third parties in his role as a YouTube director, those documents can and must be

11  sought from YouTube.  Any internal Sequoia analyses simply are not germane.

12      Plaintiffs repeated invocation of "indemnification provisions" in the Google/YouTube

13  agreement provides no answer on this point.  The Non-Parties internal analyses remain internal

14  analyses—and thus irrelevant to the underlying litigation—regardless of why they were created.

15  Any number of non-parties—law professors, journalists, and even Viacom's shareholders or

16  indemnitors—might hold an opinion about this case.  But the opinions or musings of these non-

17  parties are just that, and not an appropriate subject for discovery.[11]

18  **III.    Request Numbers 8, 19, 20, and 21 Are Invalid for Additional Reasons.**

19      The specific Requests in dispute suffer from defects beyond those identified in Section II,

20  *supra.*

21      **A.    Plaintiffs' Time Period Instruction Is Grossly Overbroad and Seeks
           Irrelevant Information.**

22

23      The Subpoenas seek documents dating from January 1, 2004 to the present.  But

24  YouTube was not even founded until February 15, 2005, as Plaintiffs acknowledge.  Motion at

25  _____

26  [11]  For what it is worth, Plaintiffs overstate the significance of the "indemnification
    provisions."  Pursuant to the agreement between Google and YouTube, at least 35 YouTube

27  shareholders—in addition to the Non-Parties—agreed to "indemnify" Google for all manner of
    claims:  alleged failures of representations and warranties in the merger agreement; alleged
    breaches of those representations and warranties; certain copyright actions; and the amount of

28  dissenting share payments.  Wilkens Decl., Exh. Y at 70-71.  There is nothing unusual about
    such a provision, let alone anything to indicate that it would generate analyses by the Non-Parties
    (or others) of relevance to the litigation.

19. Plaintiffs posit that YouTube's founders may have developed their business concept and initiated communications with potential investors before formally founding the company. *Id.* This Court need not waste time on such speculation, because the Non-Parties did not even *consider* investing in YouTube *until months after it was founded*: Sequoia first considered an investment in YouTube in August 2005. Dunn Decl. ¶ 4. Artis first considered one in or after January 2006. Lamond Decl. ¶ 3. TriplePoint first considered one in January 2006. Thorne Decl. ¶ 3. There is no basis for requiring Non-Parties to search for documents dating back far earlier than any date of possible relevance.

Plaintiffs' attempt to seek documents dated after November 13, 2006, the date Google acquired YouTube, fares no better. Motion at 19. As of November 13, 2006, Sequoia's and Artis' early seed investments in YouTube, and TriplePoint's shares of YouTube stock obtained through the exercise of its warrants, were converted to Google common stock. Dunn Decl. ¶ 9; Lamond Decl. ¶ 8; Thorne Decl. ¶ 11. The Non-Parties became just like any other Google shareholders and Mr. Botha ceased to serve on YouTube's Board. Dunn Decl. ¶ 9. Whatever purported analyses might have been undertaken by the Non-Parties in connection with their investments in YouTube or in connection with reviewing the proposed YouTube/Google merger, such analyses would, of necessity, have been completed by the merger's closing date of November 13, 2006. Likewise, even if the Non-Parties had some unique influence over YouTube—and they did not—it would have necessarily ceased by November 13, 2006.[12] There is no basis for requiring Non-Parties to search for documents dating after any date of possible relevance.

**B.    Request Number 8 Is Overbroad and Seeks Irrelevant Information Regarding Potential Investments in YouTube.**

In the interests of compromise, the Non-Parties agreed to produce documents pertaining to their actual investments in YouTube. Plaintiffs acknowledge this, but complain that the Non-

---

[12] Sequoia partner Mr. Moritz held a seat on Google's Board, but that ended in May 2007. Dunn Decl. ¶ 3. To the extent sought, whatever information Mr. Moritz obtained as a Google director must be obtained from Google, and not the venture capital firm of which Mr. Moritz is a partner.

1    Parties have objected to producing documents pertaining to third parties' *potential* investments in

2    YouTube.  Motion at 13-14.

3        Plaintiffs' demand for documents and information concerning third parties' potential

4    investments in YouTube fails for all of the reasons articulated above:  any such information must

5    be obtained directly from YouTube, or from the third parties contemplating such investments.

6    And, to the extent the Non-Parties performed some analysis of potential third parties'

7    investments in YouTube—a dubious and unsupported assertion—the Non-Parties' views on any

8    such potential investments have *nothing* to do with Plaintiffs' allegations of copyright

9    infringement in the underlying New York litigation.

10       **C.    Request Numbers 19, 20, and 21 Are Overbroad and Seek Irrelevant
         Information Regarding Google's Acquisition of YouTube.**

11

12       Request Numbers 19, 20, and 21 seek documents pertaining to Google's acquisition of

13   YouTube and to other *potential* acquisitions of YouTube.  As an initial matter, Plaintiffs'

14   demand for documents and information pertaining to *potential* acquisitions of YouTube is more

15   of the same.  If Plaintiffs seek those documents, they should obtain them first from Google and

16   YouTube.  If one of the Non-Parties possesses purely internal analyses of a potential acquisition

17   of YouTube, those documents are no more relevant than any of the other internal documents

18   Plaintiffs seek.

19       With regard to Plaintiffs' demand for documents and information pertaining to the actual

20   acquisition of YouTube by Google, this information, too, can be obtained from YouTube or

21   Google.  The Requests themselves make this plain:  Request Number 19 seeks, among other

22   things, analyses and assessments carried out by "Google, YouTube, investment banks, and any

23   other person."

24       To support their argument, Plaintiffs again rely on broad, and inaccurate, conjecture.

25   Here, Plaintiffs posit that that all three Non-Parties "would have played a significant and active

26   role in evaluating Google's acquisition of YouTube."  Motion at 13.  This is sheer speculation

27   and it is wrong.  TriplePoint played no role in connection with the merger, and conducted no

28   copyright infringement analysis for it.  Thorne Decl. ¶ 12.  Likewise, Artis—as an entirely

passive investor—did nothing more than vote to approve the merger in accordance with YouTube's Board's recommendation and at the same time that other investors so voted, performing no independent analysis. Lamond Decl. ¶ 7. Further, and also contrary to Plaintiffs' assertion, Motion at 13, no Sequoia partner sat on Google's Board for purposes of the acquisition; Mr. Moritz recused himself. Dunn Decl. ¶ 3. Whatever information Sequoia's Mr. Mr. Botha received or possessed while on YouTube's Board can and should be sought from YouTube.

Plaintiffs also again point to the merger agreement's indemnification provisions, and imagine that YouTube's potential liability for copyright infringement must have been a central consideration for the Non-Parties. *Id.* Again, not so. Plaintiffs' reliance on the indemnification provisions is entirely inapposite; these are standard indemnification provisions covering a variety of claims asserted within one year of the merger. One simply cannot infer from them that the Non-Parties are likely to have relevant information concerning the claims in the underlying New York litigation—much less information that is different from that possessed by YouTube or Google, or information that justifies the burdensome search that Plaintiffs would force Non-Parties to undertake.

### D. Requiring Further Search and Review Would Impose an Undue Burden.

As detailed above, the Non-Parties have already expended significant time and resources, and endured disruption to their businesses, to search for responsive documents. *See infra at* Factual Background, Section E. To require the Non-Parties to go back and search their files again would magnify those burdens—and it would be particularly *undue* in view of the limited or non-existent relevance of the information sought.

Plaintiffs make the remarkable, and not surprisingly unsupported assertion that "venture capital firms like Respondents are likely to store documents in a way that makes responsive information easy to find." Motion at 21. This is simply untrue. Artis would have to recreate and search electronic documents on backup tapes, an arduous process estimated to take seventeen to twenty full days. Riemer Decl. ¶¶ 6-7. And, there can be no assurance that the entire universe of documents to be searched would be recreated, or that keyword searches of restored documents

1   would be successful.  *Id.*  Furthermore, to search additional electronically stored information,

2   Artis would have to construct keyword searches to be run by an outside vendor, and then run

3   sub-searches.  *Id.* at ¶ 7.  This process is likely to take at least four to five additional days.  *Id.*

4        The burden would be no less significant for Sequoia or TriplePoint.  Sequoia would have to

5   retread the steps it already took:  spend at least 30 hours of on-site IT consultant time, plus another

6   week of vendor time as managed by an IT consultant, to recreate and search documents from

7   backup tapes.  Dunn Decl. ¶ 17.  In addition, Sequoia has worked with Google on a number of

8   deals entirely unrelated to YouTube.  *Id.* at ¶ 3.  Merely conducting a keyword search for

9   "Google," for example, would capture far too much information to review and process and risk

10  substantial business disruption.  *Id.* at ¶ 18.  Finally, TriplePoint estimates that a second search

11  would require significant additional time of a senior member of its staff's time.  Thorne Decl. ¶ 18.

12       Plaintiffs wrongly dismiss the extensive efforts already undertaken—labeling them a "self-

13  serving initial search"—and disregard entirely the burdens that would occasion a further search and

14  collection effort.  Motion at 21.  Yet it was Plaintiffs who demanded that the Non-Parties conduct

15  their search for responsive documents before final resolution had been reached on all outstanding

16  issues.  Indeed, as far back as December 2007 and months before the meet and confer process would

17  end, Plaintiffs demanded a date certain upon which documents would be produced.  Rubin Decl., ¶ 6,

18  Exh. E.  These demands came with increasing frequency in the months that followed.  Id.

19  Accordingly, the Non-Parties  undertook the onerous process of searching for, collecting and

20  reviewing documents, so that they could be in a position to produce the agreed-upon materials within

21  Plaintiffs' requested timeframe—with the expectation that doing so would prevent the need for

22  motion practice.  Instead, those efforts have now been distorted in Plaintiffs' misguided effort to cast

23  the Non-Parties as unreasonable.  The Non-Parties should not be made to undertake a second

24  burdensome search when Plaintiffs themselves set in motion the search that the Non-Parties have

25  already conducted.

26

27

28

**IV.     Any Production by the Non-Parties Must Be Governed by a Suitable Protective Order Entered by this Court.**

During the meet and confer process, the Non-Parties repeatedly advised Plaintiffs that any production must be governed by a suitable protective order entered by this Court. *See* Wilkens Decl. Exhs. HH at 8, KK at 4. Although Plaintiffs now dispute this, Motion at 8, 15, entry of a protective order by this Court is critical for at least three reasons.

*First*, and most fundamentally, any production will necessarily take place in California, where the Non-Parties, their documents, and their employees are all located. Dunn Decl. ¶ 19; Riemer Decl. ¶ 11; Thorne Decl. ¶ 19. The Subpoenas were issued from this Court, and this Court has now been called upon to rule on certain aspects of them. Fed. R. Civ. P. 45(a)(2)(C), (c)(3). This Court should therefore address any issues arising from the subsequent production, in California.

*Second*, as noted above, each of the Non-Parties, their documents, and their employees are located in California. The Non-Parties should not have to bear the considerable expense and burden of enforcing any protective order in New York.

*Third*, and relatedly, *Plaintiffs have already violated the protective order entered in New York*. Just last week, the district court in New York ruled that Plaintiffs violated its protective order by providing documents designated as "Confidential" and "Highly Confidential" to an individual who is suing YouTube and Google in separate litigation in California. Rubin Decl., ¶ 4 Exh. C. Those "Confidential" and "Highly Confidential" documents included documents produced by nonparties, including a nonparty who produced documents pursuant to a subpoena issued from this Court. The nonparties had designated their documents as "Confidential" and "Highly Confidential" under the New York protective order. Thus, Plaintiffs' violation of the New York protective order directly affected the rights of nonparties. The Non-Parties should not, under any circumstances (and certainly not under those presented here), have to bear the risk, expense and burden of litigating in New York to enforce the terms of a protective order governing their production of documents in California.[13]

---

[13] Although TriplePoint may have originally produced a limited set of documents pursuant to a protective order entered in New York, Wilkens Decl., Exh. II, it later determined that it should not have to bear the expense and burden of enforcing the protective order in New York. TriplePoint's

1

## CONCLUSION

2      For the foregoing reasons, Plaintiffs' Motion should be denied.

3  Dated:  July 21, 2008                          Respectfully submitted,

4                                                  WILSON SONSINI GOODRICH & ROSATI
                                                   Professional Corporation
5

6                                                  By:   /s/ Michael Rubin
                                                        Michael Rubin
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

concerns were prescient, given Plaintiffs' subsequent violations of the New York protective order.